## HAMILTON et al. v. F. STRAUSS & SON, Inc., et al. *

### No. 4764.

Court of Appeal of Louisiana.
Second Circuit.

May 4, 1934.

John C. Hollingsworth, of New Orleans, and Theus, Grisham, Davis & Leigh, of Monroe, for appellants.

Thompson & Dorman, of Monroe, for appellees.

TALIAFERRO, Judge.

Plaintiffs, husband and wife, accompanied by three friends, all of the colored race, about 10 o'clock the night of May 15, 1933, while motoring southerly in their Buick automobile on the Monroe-Bastrop paved highway, collided with the rear left wheel of a heavily loaded semi-trailer attached to, and being drawn by, defendant's truck, proceeding northerly. As an immediate effect of the impact, plaintiffs' car, with the left front wheel and radius rod damaged, made a sharp circular movement to its left, heading across the road into the ditch, and violently collided with a telephone pole on the east side of the ditch, where it rested in a badly damaged condition. Wade Hamilton, the driver, was thrown completely out of the car and landed on his head in the water in the ditch, though he suffered no serious injury. His wife was hurled against the dash and windshield and was painfully cut and injured. They sue the owner of the truck, F. Strauss & Son, Inc., and its insurer, for damages for their injuries and for total destruction of the car. They allege that their car was being driven at a moderate rate of speed, keeping well on its side of the road, as it approached defendant's truck, and continued this rate of speed and position on the road until the trailer swung westerly across the meridian traffic line in the road and struck the left front wheel of their car, with the results above enumerated. The specific negligence charged to the operator of defendant's truck is that he was driving at a too rapid rate of speed, approximately 40 miles per hour, and veered the truck to his left across the meridian line, in the effort to pass an automobile in front of it, going in the same direction, and, discovering the presence and approach of plaintiffs' car, suddenly steered the truck to his right in the attempt to regain his side of the road, with the result that the trailer swung so far to its left side as to contact with plaintiffs' car in the manner above described.

*Rehearing denied June 4, 1934.

Defendants deny that the accident was caused by any carelessness or negligence whatever on the part of its servant, operating the truck, and aver that plaintiffs' car, while traveling at the imprudent and excessive rate of from 40 to 55 miles per hour, was turned to its left and ran across the center of the road and into defendant's trailer, at a time it and the truck drawing it were on the right (east) side of the highway, going at 15 miles per hour, and therefore aver that the accident was caused solely by plaintiffs' own negligence. They also allege, inconsistently with prior allegations, that plaintiffs' car, at the time of the collision and for a considerable distance prior thereto, was being driven at said rate of speed, on its left side of the highway; and it is further averred that plaintiffs' car, traveling at said rapid and excessive rate of speed, was zigzagging along the highway, crossing to left and right, at frequent intervals, and, when the collision occurred, it was on its left-hand side of the road. The suit is further defended on the ground that the parties in plaintiffs' car were on a joint adventure when the accident occurred, in that they were out joy riding for their mutual pleasure.

The right of Jessie Hamilton, the wife, to recover, is denied because, it is alleged, she did not protest against the excessive speed her husband was driving the car, though on the front seat with him. Contributory negligence on part of plaintiffs, barring right to recover, even if defendant's servant were negligent, in the alternative, is pleaded by defendants.

From a judgment for Wade Hamilton for $410.75 and for his wife for $500, defendants prosecute this appeal. Plaintiffs here pray for substantial increase in both judgments.

■ The testimony of both plaintiffs, corroborated by their three male companions riding with them, is to one accord, and that is that plaintiffs' car was traveling at a speed of not more than 25 miles per hour and well on its side of the highway, when defendant's trailer, swung into it as the truck, after an unsuccessful effort of the driver to pass a car preceding it, was suddenly steered into and upon its proper side of the highway. Defendant's driver, as a witness, admitted that plaintiffs' car was being driven on its side of the road from the time he first observed it approaching him until after it passed the cab of the truck in which he was sitting, and then is when, he says, it suddenly cut diagonally across the black line and ran into the rear of the trailer. He does not explain how or why he knew this to be true when he was driving the truck and keeping watch on the road ahead. Plaintiffs' version of the facts of the collision is further corroborated by the testimony of Mr. Frank Eyre, a white man, wholly disinterested. He was in his own car behind (south of) defendant's truck, about one-fourth of a mile, and was the first person to arrive upon the scene after the accident. He immediately examined the physical markings and signs on the pavement, and testified that these showed plainly that the trailer was on its left side of the black line when it collided with the automobile, that tire marks, caused from skidding, were there, and that the course of the Buick car, after the impact, could easily be followed from its tracks on the pavement and shoulder to the telephone pole against which it was then resting. He further stated that the telephone pole was east of a point in the road about 20 feet south of the point of collision, and that the Buick car made a sharp circular movement after being hit. He is an auto mechanic of several years' experience, and stated that it was his opinion that, had the Buick been traveling 40 miles or more per hour, it would have capsized in making such a sharp movement.

■ The truck with trailer, over all, measured 33 feet. The trailer was 16 feet long and carried a heavy load of produce. The truck was also loaded. The two carried some seven and one-half tons. The trailer chassis was attached to the truck at and by means of a fifth wheel or knuckle through which a pin passed, engaging the mechanism and holding the truck and trailer in such close proximity as to apparently present a solid unit. However, the two together do not constitute a rigid unit because it was necessary in negotiating curves and turns in the roads and streets that there should be some lateral motion of the trailer. Defendant's driver stated that, unless this were true, if a sudden turn were made to left or right, under a heavy load, the trailer would turn over. This is undoubtedly true, and is supported in reason. The exact extent of the maximum of the lateral motion of the truck is not definitely fixed. It is a matter of common knowledge to operators of automobiles, regardless of size or make, that, when a sharp turn, such as a 90-degree angle, is suddenly undertaken, while the car is proceeding on a straight course, the rear end will leave the tangent on which it is moving and project itself, in

the movement to line up with the front end, to one side or other, dependent upon which direction the turn is made. And so it was, we think, in this case.

Defendant's driver's testimony is not consistent all the way through. He testified that the truck was traveling at from 20 to 25 miles per hour, and that the Buick was going about twice that speed; that the truck was so governed that 32 miles per hour was its maximum speed, and insists he at no time undertook to pass the car preceding him, he says, 100 yards. He was on his side of the black line before and when run into by the plaintiffs' car. According to his testimony, plaintiffs, in effect, deliberately left their side of the road, on which he and they say they had continuously traveled, and ran into the trailer across the black line. This is not the most reasonable explanation of why the collision occurred, but is unreasonable and is contradicted by the clear preponderance of the testimony. He says he did not see plaintiffs' car until it was not more than 25 yards from him. This was doubtless when he came from behind the car ahead of him and undertook to pass it. One of the most glaring discrepancies in his evidence may be seen from the following excerpts quoted therefrom:

"A. Well, after I turned off of DeSiard street going up the highway north I was on my side of the road, driving I imagine between 20 and 25 miles an hour. Was not over that I know. I was on my side of the road. I saw him coming on to me. I couldn't get off the concrete with a five ton load on there, if I had—

"Q. I didn't hear that? A. I couldn't get off the concrete with a five ton load on the truck. Fact of the business was not hardly anyone would do it. I never thought the car was going to run into me at all. It cleared the front wheel of the truck and the middle wheel, and the left front wheel of his car hit the left trailer wheel of my truck. * * *

"Q. This car traveling ahead of you a hundred yards, when that car passed the Wade Hamilton car, can you tell us the way the Wade Hamilton car was being driven? A. Yes sir, looked to me like it was on its side of the road.

"Q. How was the Wade Hamilton car driven after it passed that car and until it reached your truck? A. Well, it was on its side of the road until it got about to my trailer.

"Q. And you testified as to the rate Wade Hamilton's car was being driven at as forty or more miles an hour? A. Around forty."

In one breath he says it was bearing down upon him, but he could not drive his truck onto the road's shoulders, and in another he says it was on its side of the road until it had passed the front and rear wheels of the truck. These statements are wholly irreconcilable. Both cannot be true. The colored boy accompanying this driver in the main corroborated his testimony. He says, however, the car ahead of the truck was only 100 feet distant, and that he never left the truck to inspect the locus of the collision, while there is evidence in the record that he did go to the locus and carried a flash-light while others were inspecting the road.

There is some dispute as to whether the truck and trailer were equipped with adequate lights. We think they were, but the weight of the testimony does not support the contention that they were all burning when the collision occurred. However, this has no material bearing upon the one real issue in the case; nor does the rate of speed at which the vehicles were going necessarily determine the question, or have material bearing upon the issue of liability. We think the case is clearly with plaintiffs as to whose negligence caused the collision.

■■ The defense of joint adventure is untenable, as is also that tendered against the wife's right to recover because she did not object to or protest against the speed her husband was driving his car.

### Quantum of Damages.

■ Plaintiffs' car was a second hand one. He purchased it the day of the accident for $265. The only testimony as to its value after the accident was that it was worth eight or ten dollars as junk. It seems to us this is an exceedingly low valuation, but there is no testimony to refute this fixing. The lower court allowed Wade Hamilton $255 for the destruction of the car, and $55.75 for his wife's physician's, drug, and hospital bills, and $100 for his own shock, pain, suffering, and bruises, or a total of $410.75. This plaintiff made a near miraculous escape from serious bodily injury when the collision occurred. He was violently hurled from the car into the road ditch and knocked unconscious for a few seconds. He suffered no wounds beyond abrasions of the scalp. The shock must have been great. We think him entitled to $100 more than given him by the lower court.

■ Jessie Hamilton was 27 years old and weighed 225 pounds when injured. She was carried directly from the site of the collision to a sanitarium in Monroe, a few miles dis-

tant, and remained there a brief time. While there, her wounds were treated by a physician, and she returned to her home. She had a large, deep cut on the left arm, which was sutured by several stitches; a wound about one elbow, and one below the left knee. These latter wounds were not nearly so serious or painful as that on the arm. She also had bruises and abrasions nearly over her entire body. Swelling followed the first treatment, accompanied by pain. She lost considerable blood. All the wounds responded promptly to treatment, and, long before the case was tried, they were entirely well. No scars were noticeable on casual inspection except at the elbow. She suffered from stiffness and soreness of the leg and arm for 3 or 4 weeks, during which time her physician regularly treated her. It is shown that for many days after being hurt she experienced severe pain and suffering from her injuries; during most of this time she was confined to bed. She was given stimulants when first injured, and tetanus serum against danger of lockjaw. The award to her by the lower court, while quite conservative, is not patently inadequate. It will be affirmed.

For the reasons assigned, the judgment in favor of Wade Hamilton appealed from is amended by increasing the amount thereof to $510.75, and, as amended, said judgment, and that in favor of Jessie Hamilton, are affirmed, with costs.